# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

VINCENT STEWART                                    CIVIL ACTION

VERSUS                                             NO. 07-4072

BURL CAIN, WARDEN                                  SECTION "F"(4)

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2)(2006).[1]

## I.   Factual and Procedural Background

The petitioner, Vincent T. Stewart ("Stewart"), is a convicted inmate incarcerated in the Dixon Correctional Institute in Jackson, Louisiana.[2] He filed this application for the issuance of a writ of habeas corpus seeking either a retrial or his release from prison within ninety days of the entry of an order by the Court.

---

[1] Under 28 U.S.C. § 2254(e)(2), an Evidentiary Hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2] Rec. Doc. 1.

A.     **Factual Summary**

On December 2, 2001, Stewart was arrested on outstanding attachments and questioned as a part of the investigation into the December 1, 2001, shooting death of Titus White.[3]  During the investigation of the murder, Stewart gave four statements to the police which form the basis of his request for habeas review.

The first statement occurred on December 2, 2001, after Stewart executed a rights of arrestee form.  Stewart gave his first statement between 6:05 p.m. and 6:25 p.m.  Stewart told Sergeant Dennis Thornton that he picked up his friend, the victim, Titus White, at 11:00 p.m. at his house on Hooter Road.  They rode around and went to clubs.  He later dropped-off White at the E-Z Serve near Hooter Road and Bridge City Avenue at approximately 2:30 a.m. or 3:00 a.m.  White was supposed to meet a girl named "Stacy" there.  Stewart stated that he did not have anything to do with White's death, that he was not near the location when White was killed, and that he did not know who killed White.  Stewart told Sergeant Thornton that he was telling the truth and that he would take a polygraph test.

Approximately ten minutes after the first statement ended, Sergeant took a second statement from Stewart lasting from 6:35 p.m. to 6:56 p.m.  Stewart did not execute another waiver of rights form at that time, although he indicated to Sergeant Thornton that he was going to give the second statement of his own free will based on the first form that was used.  Stewart stated that, between approximately 2:30 a.m. to 3:00 a.m., he took White and another person named "Leroy" to Jamie Street in Avondale where they got out of his car.  Stewart indicated that White told him that he was

---

[3]The facts are taken from the published opinion of the Louisiana Fifth Circuit Court of Appeal on direct appeal, and as necessary from the summary of facts appearing in the State's brief on appeal. *State v. Stewart*, 902 So. 2d 440, 443-45 (La. App. 5th Cir. 2005); St. Rec. Vol. 2 of 6, 04-KA-1231, pp. 2-6, 4/26/05; St. Rec. Vol. 5 of 6, State's Appeal Brief, 04-KA-1231, pp. 2-5, 12/8/04.

going to Stacy's house and that it was alright if Stewart left, so he did. Stewart explained that he had a "bad feeling" when Leroy got out of the vehicle with White.

After giving this second statement, Stewart remained in the interview room while the officers attempted to verify the information given in the first two statements. He was allowed to use the restroom and to get food and drink.

At about 1:15 a.m. on December 3, 2001, Stewart gave a third statement to Sergeant Thornton and Detective David Morales. He stated that he and White met Leroy at a sports bar in Westwego. After, he said that they went to White's house, and that White went inside his house and came out with a duffel bag containing latex gloves, a revolver, a ski mask, and some tape. After that, they went down the street, and White told Leroy to go check behind the house. When Leroy returned he had a shotgun.

Stewart told the officers that he drove them to Jamie Street in Avondale and parked. Leroy and White put on the masks and gloves and jumped out of the vehicle with their guns. He further stated that White told him that he was going to a house, because he had heard there was money and drugs inside. Stewart stated that he felt that they were going to kill somebody. About three minutes later, Stewart saw Leroy run from the house dragging White's body. Leroy left White's body in the street and got into the car. Leroy told Stewart that he accidentally shot White because he thought White was a resident of the house. Stewart wanted to get White's body, but Leroy told him to take him to Marrero or he would kill him. Stewart brought Leroy to a house, saw him go inside, and then Stewart left. Stewart also failed a polygraph test later that day, December 3, 2001.

On December 4, 2001, at 3:30 p.m., Detective Morales advised Stewart that he was under arrest for murder and he read Stewart his rights. Thereafter, Stewart gave a fourth statement. He

stated that, the night before, he had taken the officers to a location in Marrero and pointed to a house where a man named "Frog" resided. Stewart said that he had taken Frog and White to 112 Marie Drive in Avondale, that Frog and White went inside to burglarize the house, and that a short time later he saw Frog carrying White's body into the street. Stewart explained that he also had taken the officers to two bad addresses the night before because he thought that, if he showed the officers where Frog lived, Frog would kill him. Stewart also stated that he was shown a photographic lineup and had positively identified Frog.

## B.   State Court Procedural History

Stewart's original appointed counsel filed omnibus motions, including a motion to suppress Stewart's statements.[4] The Trial Court held evidentiary hearings on the motion to suppress on April 1 and 2, 2003, after which the Court denied the motion to suppress the statements.[5] After enrollment of other appointed counsel, on February 2, 2004, the Court heard renewed argument and again denied the motion to suppress the statements.[6]

Thereafter, on July 14, 2004, Stewart entered a guilty plea to the lesser charge of manslaughter, reserving his right to appeal the denial of the motion to suppress the statements under *State v. Crosby*, 338 So. 2d 584 (La. 1976).[7] On August 2, 2004, he filed a motion to withdraw the guilty plea because he entered it without obtaining a ruling on a motion to reconsider the denial of

---

[4]St. Rec. Vol. 1 of 6, Defense Omnibus Motions, 2/14/02.

[5]St. Rec. Vol. 2 of 6, Motion Hearing Minutes, 4/1/03; Motion Hearing Minutes, 4/2/03; St. Rec. Vol. 5 of 6, Hearing Transcript, 4/1/03; Hearing Transcript, 4/2/03.

[6]St. Rec. Vol. 2 of 6, Motion Hearing Minutes, 2/2/04; St. Rec. Vol. 5 of 6, Hearing Transcript, 2/2/04.

[7]St. Rec. Vol. 2 of 6, Plea Minutes, 7/14/04; Defendant's Acknowledgment of Constitutional Rights and Waiver of Right on Entry of Plea of Guilty, 7/14/04;St. Rec. Vol. 5 of 6, Plea Transcript, 7/14/04. Under Louisiana law, a *Crosby* plea allows the defendant to reserve the right to appeal the denial of his motion to suppress.

the motion to suppress.[8]   The Trial Court denied the motion on procedural grounds stating as follows:

> Defendant has filed a Motion to Withdraw his Guilty plea based on Constitutional violations.  Defendant's claims are properly raised in an application for post-conviction relief.  Pursuant to Louisiana Code of Criminal Procedure 926(D), a petitioner of Post Conviction Relief 'shall use the uniform application for post conviction relief approved by the Supreme Court of Louisiana.'  Furthermore, Subsection (E) of 926 provides, '[i]nexcusable failure of the petitioner to comply with the provisions of this Article may be a basis for dismissal of his application.'  Defendant has failed to use the proper application to file his Post Conviction Relief application.  Defendant should re-file his application in compliance with Louisiana Code of Criminal Procedure Article 926(D).

State Record Volume 2 of 6, Trial Court Order, August 5, 2004.  The Court also denied as repetitive Stewart's subsequent motion to reconsider the denial of the foregoing motion.[9]

On appeal to the Louisiana Fifth Circuit, Stewart's appointed counsel argued that the Trial Court erred in denying the motion to suppress on the grounds that Stewart did not adequately waive his constitutional rights and on grounds of duress, including the length of the interview process.[10]  In a *pro se* filed supplemental brief, Stewart also asserted four additional assignments of error:[11] (1) the testimony of the officers at the suppression hearing was inconsistent and did not meet the State's burden of proving that the statements were knowingly and voluntarily made; (2) the third and fourth statements were inadmissible; (3) the Trial Court erred in denying the motion to withdraw the guilty plea under La. Code Crim. P. art. 926(D), which did not apply to that type of motion pursuant to La.

---

[8] St. Rec. Vol. 2 of 6, Motion to Withdraw Guilty Plea, 8/2/04.

[9] St. Rec. Vol. 2 of 6, Motion to Reconsider Motion to Withdraw Guilty Plea, 8/30/04.

[10] St. Rec. Vol. 5 of 6, Appeal Brief, 2004-KA-1231, 11/18/04.

[11] St. Rec. Vol. 5 of 6, Supplemental Appeal Brief, 12/8/04.

Code Crim. P. art. 559; and (4) the trial court erred in sustaining the State's objections to defense counsel's cross-examination of Sergeant Thornton at the suppression hearing.

On April 26, 2005, the Louisiana Fifth Circuit affirmed the conviction and sentence finding no merit to any of the grounds raised.[12]  Specifically, the Court held as follows: (1) Stewart did not have to be advised of his *Miranda*[13] rights prior to his second and third statements to the law enforcement officer; (2) the second and third statements were not rendered involuntary because he was in interrogation for nine hours without benefit of sleep or conversation with his relatives; (3) the record showed that Stewart knowingly and voluntarily waived his *Miranda* rights with respect to interrogation about aggravated burglary as well as the murder; and (4) the Trial Court did not violate Stewart's constitutional rights to confrontation in the suppression hearing by refusing to allow him to ask certain question of the officer at the suppression hearing.  The Court also ordered the Trial Court to notify Stewart of the delays for seeking post-conviction relief, and the Trial Court complied on April 29, 2005.[14]

On May 10, 2005, Stewart submitted  a writ application with the Louisiana Supreme Court seeking review of only two claims:[15] (1) the State failed to demonstrate that Stewart understood his rights and waived those rights when he gave the third statement; and (2) the Trial Court erred by

---

[12]*State v. Stewart*, 902 So.2d at 445; St. Rec. Vol. 2 of 6, 04-KA-1231, 4/26/05.

[13]A defendant's waiver of his constitutional rights is valid if it is voluntary, knowing, and intelligent. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[14]St. Rec. Vol. 1 of 6, Notice of Prescriptive Period for Post-Conviction Relief, 4/29/05.

[15]St. Rec. Vol. 6 of 6, La. S. Ct. Writ Application, 05-KO-1584, 6/15/05 (showing postal metered 5/11/05, signature dated 5/10/05); St. Rec. Vol. 1 of 6, La. S. Ct. Letter, 2005-KO-1584, 6/15/05 (showing postal meter 5/11/05).

6

denying the motion to suppress the statements. The Court denied Stewart's application without stated reasons on January 26, 2006.[16]

Stewart's conviction became final 90 days later, on April 26, 2006, because he did not file a writ application with the United States Supreme Court. *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. S. Ct. Rule 13(1).

On May 24, 2006, Stewart submitted an application for post-conviction relief, and supplement thereto, to the Trial Court raising three grounds for relief:[17] (1) the State failed to demonstrate that Stewart understood his rights at the time the third statement was given; (2) his trial counsel gave ineffective assistance where he: (a) failed to introduce state exhibits one through seven at the suppression hearing to show that Stewart was not advised that he was being detained and arrested for aggravated burglary, (b) failed to impeach the testimony of Detective Morales during the suppression hearing, and (c) failed to interview witnesses before advising Stewart to enter the guilty plea; and (3) the State withheld exculpatory evidence which he has not been able to discover.

Nevertheless, on June 12, 2006, the Trial Court denied Stewart's application for post-conviction relief.[18] The Court resolved that the first claim was repetitive of the claim addressed on direct appeal. The Court further found that Stewart's ineffective assistance of counsel was factually baseless and without merit. Further, the Court held that the third claim raised a defense that had

---

[16]*State v. Stewart*, 922 So.2d 545 (La. 2006); St. Rec. Vol. 6 of 6, La. S. Ct. Order, 2005-KO-1584, 1/27/06.

[17]St. Rec. Vol. 3 of 6, Application for Post-Conviction Relief, 5/24/06.

[18]St. Rec. Vol. 3 of 6, Trial Court Order, 6/12/06.

been waived and had to be denied on procedural grounds, citing La. Code Crim. P. arts. 926(d) and 926(B)(3).

It appears from the record that, on May 24, 2006, the same day the application for post-conviction relief was originally submitted, Stewart also attempted to file a supplement to the application raising ineffective assistance of counsel for failure to put the State's case to a meaningful challenge.[19] The supplement was never file stamped and the claims were not addressed by the Trial Court in the June 12, 2006, Order. On September 7, 2006, Stewart requested the Trial Court to file and address that supplement as an application for post-conviction relief.[20] The Trial Court denied this application for post-conviction relief on October 17, 2006, as repetitive.[21]

In the meantime, on August 4, 2006, the Louisiana Fifth Circuit denied Stewart's writ application, finding no error in the Trial Court's June 12, 2006, ruling.[22] Thereafter, on August 24, 2006, Stewart submitted a writ application to the Louisiana Supreme Court seeking review of the first two claims raised in application for post-conviction:[23] (1) the State failed to demonstrate that Stewart understood his rights at the time the third statement was given; and (2) his trial counsel gave ineffective assistance where he: (a) failed to introduce state exhibits one through seven at the suppression hearing to show that Stewart was not advised that he was being detained and arrested

---

[19]St. Rec. Vol. 3 of 6, Supplement to Application for Post-Conviction Relief, dated 5/24/06.

[20]St. Rec. Vol. 1 of 6, Post-Conviction Application, 9/15/06 (dated 9/7/06).

[21]St. Rec. Vol. 1 of 6, Trial Court Order, 10/17/06.

[22]St. Rec. Vol. 6 of 6, 5th Cir. Order, 06-KH-569, 8/4/06. Prior to this, on July 7, 2006, the Louisiana Fifth Circuit also denied Stewart's application for writ of mandamus in which he sought to compel the Trial Court to rule on his post-conviction application. St. Rec. Vol. 3 of 6, 5th Cir. Order, 06-KH-483, 7/7/06.

[23]St. Rec. Vol. 6 of 6, La. S. Ct. Writ Application, 06-KH-2257, 9/13/06 (postmarked 8/25/06; dated 8/24/06); St. Rec. Vol. 3 of 6, La. S. Ct. Letter, 2006-KH-2257, 9/13/06 (showing postmark 8/25/06).

for aggravated burglary, (b) failed to impeach the testimony of Detective Morales during the suppression hearing, and (c) failed to interview witnesses before advising Stewart to enter the guilty plea.

Stewart also added for the Court's review his supplemental claim of ineffective assistance of counsel for failure to put the State's case to a meaningful challenge, which was never addressed by the Trial Court.[24] In raising these claims, Stewart argued that the Trial Court abused its discretion in summarily denying his ineffective assistance of counsel claims and that the Trial Court erred in failing to consider his first claim as repetitive.[25] On May 18, 2007, the Louisiana Supreme Court denied Stewart's application without stated reasons.[26]

## II. __Federal Petition__

On August 10, 2007, the Clerk of this Court filed Stewart's petition for federal habeas corpus relief in which he raised three grounds for relief:[27]

(1) his counsel gave ineffective assistance in the following ways:
   (a) counsel failed to impeach Detective Morales's testimony at the suppression hearing;
   (b) counsel failed to establish that the third statement was given under duress;
   (c) counsel failed to interview witnesses;
   (d) counsel failed to interview Dennis Mathis, in order to investigate Mathis's [sic] first statement given on December 1, 2001 and his second statement given on January 8, 2002;
   (e) counsel failed to interview Deputy Kelly Carrigan to investigate the contents of the initial police report written by Deputy Carrigan;
   (f) counsel failed to interview Terry McCall;

---

[24]*Id.*

[25]*Id.*

[26]*State ex rel. Stewart v. State*, 957 So. 2d 147 (La. 2007); St. Rec. Vol. 6 of 6, La. S. Ct. Order, 2006-KH-2257, 5/18/07.

[27]Rec. Doc. Nos. 1, 25.

(g)     counsel failed to investigate the statement made by Burnell Johnson on December 1, 2001;

(h)     counsel failed to investigate the statement made by Semaj Johnson on December 1, 2001;

(i)     counsel failed to investigate the statement made by Jeremy White on December 2, 2001;

(j)     counsel's performance was deficient when he recommended a guilty plea without impeaching Detective Morales's testimony during the suppression hearing, for failure to interview witnesses and investigate discrepancies between the testimony of Stewart, Mathis, S. Johnson and B. Johnson;

(k)     counsel's failure to impeach Detective Morales' testimony, conduct an independent investigation, and interview potential witnesses was not sound trial strategy; and

(l)     counsel's performance prejudiced Stewart where the State's sole evidence was his self-incriminating statements.

(2)     the state failed to demonstrate that Stewart understood his rights at the time the third statement was given.

(3)     the trial court erred in denying the motion to suppress the statements obtained in violation of the Louisiana Constitution of 1974, Article 1 Section 13.

The State filed a response in opposition to Stewart's petition arguing that Stewart failed to raise a cognizable federal question because he was convicted by plea of guilty and waived his right to review.[28]  The State further argues that his claims are without merit.  Stewart responded to the State's opposition arguing again the merits of his claims.[29]

## III.     **General Standards of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[30] applies to this petition, which is deemed filed in this court under the federal

---

[28]Rec. Doc. Nos. 13, 47, 52.

[29]Rec. Doc. Nos. 14, 20, 48, 54.

[30]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996.  *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become

mailbox rule on July 18, 2007.[31]  The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c) (2006)).

The State in this case concedes that Stewart's petition is timely filed and that he has exhausted state court remedies.  The State also has not asserted that his claims are in procedural default, and the record discloses no such bar to this Court's review.  The record also supports the State's conclusions that the claims are exhausted and the federal petition was timely filed.  The Court will proceed to the merits of Stewart's claims.

## IV.  <u>Standards of Review of the Merits</u>

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000).  It provides different standards for questions of fact, questions of law, and mixed questions of fact and law.

A state court's determinations of questions of fact are presumed correct and the Court must give deference to the state court findings unless they were based on an unreasonable determination

---

effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[31]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes.  *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  The Clerk of Court filed Stewart's federal habeas petition on August 10, 2007, when the filing fee was paid.  Stewart dated his signature on the petition on June 8, 2007.  This is presumed to be the earliest date on which he could have delivered it to prison officials for mailing.  The fact that he paid the filing fee on a later date does not alter the application of the federal mailbox rule to his pro se petition.  *See Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing *Spotville*, 149 F.3d at 374).

of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2)(2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1)(2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485.

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485. A state court's decision can involve an "unreasonable application" of federal law if it either: (1) correctly identifies the governing rule but then applies it unreasonably to the facts; or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law. *cf. Wright v. West*, 505 U.S. 277, 304 (1992). The Court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law. *See e,.g., id.*, at 305; *see also Chambers v. Johnson*,

218 F.3d 360, 364 (5th Cir. 2000), *cert. denied*, 531 U.S. 1002 (2000). "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" (brackets in original) *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)); *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

Thus, under the "unreasonable application" determination, the court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006).

## V.    Denial of Motion to Suppress and Voluntariness of Statements (Claim Nos. 2 and 3)

Stewart complains that the State failed to prove that he understood his rights at the time of the third statement and that the Trial Court's denial of the motion to suppress violated Louisiana constitutional law. He further argues that his fourth statement should have been suppressed, because he was not advised that he was being arrested for aggravated burglary. Stewart and his appointed counsel first raised these claims on direct appeal to the Louisiana Fifth Circuit. The Court denied the claim as meritless. This was the last reasoned decision on the issue since the Louisiana Supreme Court denied Stewart's subsequent writ application without reasons.[32] *Ylst v. Nunnemaker*, 501 U.S. 797 (1991).

---

[32]The Court notes that Stewart challenged the State's failure to prove the voluntariness of his statement again in his application for post-conviction relief, and the state courts did not address the claims again finding them to be repetitive of the matters addressed on direct appeal. St. Rec. Vol. 3 of 6, Trial Court Order, 6/12/06.

The admissibility of a confession or incriminating statement is a mixed question of law and fact. *Miller v. Fenton*, 474 U.S. 104, 112 (1985). Thus, the Court must consider whether the state courts' denial of relief was contrary to, or an unreasonable application of, Supreme Court law.

The determination of the voluntariness of a confession or incriminating statement requires the Court to consider the "totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973). A federal court entertaining a collateral challenge to the voluntariness of a confession is obliged to afford a presumption of correctness to state court findings of fact if fairly supported in the record. *Miller*, 474 U.S. at 117. The Court, nevertheless, is authorized to exercise de novo review over the ultimate conclusion of whether, under the totality of the circumstances, the confession was "voluntary." *Carter v. Johnson*, 131 F.3d 452, 461-62 (5th Cir. 1997). Although mental state or condition may be a significant factor in the voluntariness determination, "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Id.*, 131 F.3d at 462 (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)).

There are two inquiries to determine whether an accused has voluntarily and knowingly waived his Fifth Amendment privilege against self-incrimination. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Soffar v. Cockrell*, 300 F.3d 588, 592 (5th Cir. 2002). First, the waiver of the right must be voluntary in that it was not the product of intimidation, coercion, or deception. *Moran*, 475 U.S. at 421. Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession. *Carter*, 131 F.3d at 462 (citing *Connelly*, 479 U.S. at 163-67). Second, the

relinquishment must be made with a full awareness of the nature of the right being waived. *Id*. A written waiver "is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

Thus, under federal law, whether a state defendant understood his *Miranda* rights is a factual determination for the state trial court which is subject to the presumption of correctness under 28 U.S.C. § 2254(e)(1)(2006) on federal habeas review. *See Carter*, 131 F.3d at 452; *Mincey v. Head*, 206 F.3d 1106, 1131 (11th Cir. 2000). Furthermore, a determination of whether officers engaged in coercive tactics to elicit a confession is a question of fact, and the state court's factual findings are also entitled to deference when supported by the record. *Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir. 1993); *Self v. Collins*, 973 F.2d 1198, 1204 (5th Cir. 1992); *see also Miller*, 474 U.S. at 112 (noting that subsidiary questions such as whether the police engaged in coercive tactics are afforded the presumption of correctness). Further, the habeas corpus statute obliges federal judges to respect credibility determinations made by the trier of fact on these issues. *Pemberton*, 991 F.2d at 1225 (citing *Sumner v. Mata*, 455 U.S. 591, 597 (1982)).[33]

In Stewart's case, the Trial Court conducted a full evidentiary hearing on the admissibility of his inculpatory statements, as required by *Jackson v. Denno*, 378 U.S. 368 (1964).[34] After taking

---

[33]The Court also notes that, even if a confession is deemed involuntary under these standards, the Supreme Court has held that the admission of an involuntary confession is a trial error subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Under this analysis, in order to grant federal habeas relief, the trial error must have a substantial and injurious effect or influence in determining the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Therefore, even if this Court were to find that Stewart's Fifth Amendment rights were violated, the court would have to also consider whether use of the confession at trial was harmless in determining the verdict. *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003). Based on this Court's review of the record, Stewart understood his rights and that his inculpatory statements were voluntarily given; therefore the harmless error analysis is not necessary.

[34]St. Rec. Vol. 2 of 6, Motion Hearing Minutes, 4/1/03; Motion Hearing Minutes, 4/2/03; St. Rec. Vol. 5 of 6, Hearing Transcript, 4/1/03; Hearing Transcript, 4/2/03; St. Rec. Vol. 2 of 6, Motion Hearing Minutes, 2/2/04; St. Rec. Vol. 5 of 6, Hearing Transcript, 2/2/04.

testimony of the investigating officers and reviewing the related documents, the trial court denied the motion to suppress the statements.[35]  On direct appeal, the Louisiana Fifth Circuit entered its own findings, which constituted the last reasoned decision on this issue.

In reviewing the claims, the Louisiana Fifth Circuit determined that the record proved that Stewart was advised of and understood his *Miranda* warnings prior to the first and fourth statements.[36]  The record established that he waived his rights and that both statements were freely and voluntarily given, and that he was not under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises.  The Court further found that, under the circumstances, the second statement was given close in time to the first and the record supported a finding that the statements were given of Stewart's free will and under the first waiver form signed.  The record also demonstrated that it appeared to the detectives that he understood his rights throughout the interview.

The Court went on to find that, based on the circumstances, the third statement was given during the same ongoing interview process and that Stewart still understood his rights and acted voluntarily.  The Court also determined that both the second and third statements were not given under duress, in spite of the length of the interview.  The Court held that Stewart was allowed to get food and go to the restroom, and that he did not request that the interview stop or that he be given a rest or time to contact his family.

Finally, the Court also resolved that Stewart knew that he was going to be questioned during the statements three and four relative to first degree murder, which lists aggravated burglary as one

---

[35]St. Rec. Vol. 3 of 5, Trial Transcript (continued), p. 212, 8/8/05.

[36]*State v. Stewart*, 902 So.2d at 445; St. Rec. Vol. 2 of 6, 04-KA-1231, 4/26/05.

of the possible elements of that offense.  The Court also noted that, due to the fact that White and Frog were engaged in the perpetration of an aggravated burglary when White was shot, it was made clear to Stewart that the questioning would pertain to both the murder and the burglary.

On federal habeas review, this Court must presume correct the factual determinations made by the state courts, including that Stewart understood his *Miranda* rights, knew the nature of the potential charges against him, and that the circumstances of his interview did not amount to duress. The same presumption applies to the state courts' factual findings concerning the voluntariness of the four statements, finding, among other things, that Stewart was timely advised of his *Miranda* rights, that he indicated that he understood his rights, and that he voluntarily waived those rights. *See Pemberton*, 991 F.2d at 1225.

To overcome the presumption of correctness as to these findings, Stewart must rebut these factual findings by clear and convincing evidence, which he has not done.  In his federal habeas petition and related documents filed in this case, Stewart merely repeats his allegations of duress already addressed by the state courts.  These allegations, however, are unsupported by any evidence adduced at the motion hearing, on appeal or otherwise.  The state courts' factual determinations regarding voluntariness are adequately supported by the record.  Therefore, this Court on habeas corpus review must accept as conclusive the state courts' factual determination that the challenged statement or confession was voluntary and was not a product of duress or misunderstanding.

Accordingly, the state courts' denial of relief on this issue is not contrary to, or an unreasonable application of, Supreme Court precedent.  Stewart is not entitled to relief on this claim.

## VI.     Ineffective Assistance of Counsel (Claim No. 1)

Stewart asserts that his counsel's performance was constitutionally deficient in several respects arising mainly from the alleged failure to interview witnesses, investigate their statements, and adequately discredit the officers at the suppression hearing. He first raised these claims in his application for post-conviction relief in the state courts. The Trial Court denied relief on this claim finding that counsel's performance was well within the range of professional competence. The Court further noted that the Louisiana Fifth Circuit on direct appeal had already resolved that counsel was able to thoroughly cross-examine the officers at the suppression hearing. This was the last reasoned decision on the issue. *Ylst*, 501 U.S. at 797.

The issue of ineffective assistance of counsel is a mixed question of law and fact. *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994). When a defendant pleads guilty and then seeks habeas review based upon allegations of ineffective assistance of counsel, the proper standard to be applied is the standard established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984); *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). Thus, the question before this Court is whether the state courts' denial of relief was contrary to, or an unreasonable application of, the United States Supreme Court decision in *Strickland*.

### A.     The *Strickland* Standard

In *Strickland*, the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel. First, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*., at 687-88; *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). Under *Hill*, which applies *Strickland* in the guilty plea context, the first prong is satisfied by a showing that "counsel's representation fell below an objective standard of

reasonableness." *Hill*, 474 U.S. at 57 (citing *Strickland*, 466 U.S. at 687-88). "[I]t is necessary to 'judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694; *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999). "In order to satisfy . . . [*Strickland*'s] 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. Furthermore, however, "[t]o meet the prejudice prong, the [petitioner] must affirmatively prove, and not merely allege, prejudice." *DeVille v. Whitley*, 21 F.3d 654, 659 (5th Cir. 1994); *Theriot v. Whitley*, 18 F.3d 311, 314-15 (5th Cir. 1994).

In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. *Kimler*, 167 F.3d at 893. On habeas review, scrutiny of counsel's performance "must be highly deferential" and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 689-90); *Mattheson*, 751 F.2d at 1441.

## B.    Analysis of Stewart's Arguments

### (a)&(b)    Failed to Impeach Detective Morales and Prove that the Third Statement was Given under Duress

Stewart alleges that his counsel failed to confront Detective Morales with the third inculpatory statement to establish that Morales coerced him into making a full incriminating statement.  Specifically, Stewart points to the following remark made by Detective Morales during the taking of the third statement:[37]

> They had, but Vincent they had to tell you who they were gonna [sic], what they were going to go do, you would of asked that. Remember we asked you Vincent, we said all we wanted was the truth, all the [sic] want is the truth.  Don't hold anything back we want the truth, now what did they tell you?

Stewart alleges that this demonstrates that he was being coerced and that his statement was not freely and voluntarily given.  He claims that if the statement was freely given, the detective would not have had to caution him not to hold anything back.

First, the Court has already resolved that the four statements given by Stewart were in fact freely and voluntarily given without coercion.  Asking Stewart to state the truth was not coercive.

Second, a review of the suppression hearing transcripts reflects that Stewart's counsel aggressively questioned Morales about the circumstances of the third statement, including the amount of time Stewart was held in the interview room and whether he was advised of and waived his rights.[38]  Morales testified that he had the occasion to read Stewart his rights pursuant to *Miranda* on December 3, 2001, at approximately 3:30 p.m.[39]  He testified that Stewart read his rights, and

---

[37]St. Rec. Vol. 2 of 6, Statement #3, p. 10, 12/3/01.

[38]*See, e.g.*, St. Rec. Vol. 5 of 6, Hearing Transcript, pp. 42-47, 4/1/03.

[39]St. Rec. Vol. 5 of 6, Hearing Transcript, pp. 34-35, 4/1/03.

signed each line after reading them, indicating that he understood what he read.[40]  He testified that

Stewart executed a second form on December 4, 2001, at 3:30 p.m., in which Stewart again

indicated that he wished to waive his rights.[41]

On cross examination by Stewart's counsel, Morales testified that he participated in

Stewart's arrest  on December 2, 2001, at the Siesta Motel on West Bank Expressway.[25]  Morales

testified that, although it was not necessary in light of the signed waiver, it was his procedure to go

over the witnesses rights once he turned on the recorder to tape the statement.[26]  He further indicated

that he did this prior to Stewart's fourth statement.  He did not do this prior to Stewart's third

statement because the statement was taken by Sergeant Thornton.[27]  Sergeant Thornton went over

the *Miranda* rights with Stewart before he gave the third taped statement.[28]  He also stated that

Stewart did not execute another waiver of rights form immediately prior to giving the third

statement, because one was signed prior to his first statement.[29]

Morales confirmed that they interrogated Stewart for one to two hours before taking that

statement and that Stewart was allowed to use the restroom and get drinks and snacks.[30]  He also

---

[40]*Id*. at 35.

[41]*Id*. at 37.

[25]*Id*. at  40.

[26]*Id*. at  42.

[27]*Id*. at  42-43.

[28]*Id*. at 58.

[29]*Id*. at 43.

[30]*Id*. at 44-45.

testified that Stewart was not handcuffed at the time of the third statement.[31]  Morales also testified that Stewart was questioned or interrogated in between the recorded statements.[32]

In *Miranda,* the Supreme Court held that statements made during a custodial interrogation are to be considered compelled when the interrogation is laden with the possibility of coercion, unless the defendant is informed *inter alia* of his Fifth Amendment right to remain silent.  *Miranda*, 384 U.S. at 460.  When a defendant like Stewart is read his *Miranda* rights, and he agrees to waive those rights, the waiver suffices to waive the right to remain silent and the right to have counsel present.  *Accord Patterson v. Illinois*, 487 U.S. 285, 296 (1988).  In this case, the record makes clear that Stewart was apprised of his rights and that he did knowingly and voluntarily waive those rights.

This was the focus of counsel's questioning at the suppression hearings, including his lengthy and thorough cross-examination of Detective Morales.  Stewart has not demonstrated any deficiency in counsel's questioning of Morales during the suppression hearing.  Furthermore, the Court can find no basis to conclude that Morales, or any other officer, used coercion, duress, or promises to elicit the detailed confession offered by Stewart.  This, too, was the finding of the state courts, to which this Court must give deference.

Having thoroughly reviewed the transcripts and the record, the Court finds that counsel acted within the range of sound and reasonable representation.  Stewart has not demonstrated a deficiency in his performance with regard to questioning Morales or in his efforts to establish that the third statement was not voluntary.  Counsel's performance is not to be judged on whether it was successful, but on whether a particular act or omission of counsel was unreasonable under the

---

[31]*Id*. at 44, 47.

[32]*Id*. at 44-47, 48-49.

circumstances of the case.  *Strickland*, 466 U.S. at 689 (citing *Engle v. Isaac*, 456 U.S. 107, 133-34 (1982)); *Burger v. Kemp*, 483 U.S. 776, 789 (1987); *see also*, *Rodriguez v. Portuondo*, No. 01-547, 2006 WL 2168314, at *10 (S.D.N.Y. Aug. 1, 2006) ("[w]hether counsel's failure to impeach violates the Sixth Amendment depends upon the extent to which impeachment evidence would have affected the outcome of the case," and "not every failure to impeach a prosecution witness will support an ineffective assistance claim").  Stewart has not met this burden, and he is not entitled to relief on this claim.

### (c)-(i)  Failed to Interview Witnesses

Stewart next complains that his counsel's performance at the sufficiency hearings was deficient, because he failed to interview numerous potential witnesses to verify or challenge their statements before advising him to plead guilty.  He lists these witnesses as: Dennis Mathis, Deputy Kelly Carrigan, Terry McCall, Semaj Johnson, and Burnell Johnson before.  According to Stewart, if his counsel had questioned Mathis, he would have realized that the statements Stewart gave to the police were not reliable and were in conflict with Mathis' statement.  He claims that Mathis told the police that his nephew, not Stewart, was the person driving his 1983 automobile on the night of the incident.

Stewart also contends that if his counsel had interviewed Deputy Carrigan, who prepared a supplemental to the police report, he could have obtained the names and address of several witnesses who would have indicated that they observed a red, four door, mid-size  car, possibly a Chevrolet, on the night of the murder.  Stewart suggests that his counsel could have taken the testimony of these other witnesses, which would have contradicted Stewart's description of the vehicle involved in the crime.

Stewart further argues that had his counsel interviewed Terry McCall about the identity of the person who gave him the eighty-five dollars, he would have learned that it was not Stewart. He claims that his counsel would have learned that McCall did not go to the Siesta Motel, and that it was Mathis' wife who signed the receipt for the towing.

Regarding the other witnesses, Semaj and Burnell Johnson, Stewart contends that had his counsel interviewed Burnell Johnson, he would have determined that Stewart's third statement, in which he described the perpetrator as wearing black, was incorrect and not reliable. Regarding counsel's failure to interview Semaj Johnson, he again would have learned that her account of the events conflicted with his third statement in which he indicated that the suspect had taken off his mask and got into Mathis's car.

The essence of Stewart's position is that, had his counsel interviewed the witnesses, he would have had sufficient evidence to present suggesting that the state was not able to prove the perpetrator's identity beyond a reasonable doubt, and would not have recommended that Stewart enter the guilty plea. Stewart's position is that the information provided by these witnesses would have been sufficient to overshadow his own admissions and statements to the contrary, or at the very least, would have supported his position that his statements were not reliable and were coerced.

"Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Graves v. Cockrell*, 351 F.3d 143, 156 (5th Cir. 2003) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)). In this case, Stewart references the statements made by these witnesses which are part of the state court record. The very fact that the witnesses gave statements to the police, which were provided to the defense, would make it unnecessary for

counsel to expend the time and money to interview the witnesses again. Nevertheless, a review of the referenced police report and statements shows that counsel was not deficient in pursuing further interviews or in recommending the plea of guilty.

In the police report authored by Deputy Carrigan, he indicates that "also to be noted several residents in the area observed a red in color, four door car, possibly a Chevrolet midsized [sic] car, speeding down the street earlier this night."[25] Stewart complains that this conflicts with his description given to the police that the car he drove that night, belonging to Dennis Mathis, was a white Oldsmobile Celebrity with a blue top.[26] Stewart alleges that his counsel should have heeded the notation in the police report and sought to locate the witnesses who identified the red car.

There is nothing in the police report to suggest that anyone identified the perpetrators as being in the red car. Also, the police report to which Stewart refers does not identify the "several residents" to whom Deputy Carrigan spoke. It is unlikely that asking Deputy Carrigan three years later to identify those residents would have been fruitful. Nevertheless, there is no actual link in the report between the speeding red car, or the time that it was seen, and the murder.

Furthermore, in his statement to police, Dennis Mathis described his car as a white 1983 Chevrolet Celebrity with a blue roof.[27] He specifically stated that he loaned the car to Stewart on the evening of November 30, 2001.[28] This was not inconsistent with Stewart's statements to police. Stewart's representation that the statements were in conflict is factually baseless.

---

[25]St. Rec. Vol. 3 of 6, Police Report, 12/2/01.

[26]St. Rec. Vol. 2 of 6, Statement #1, p. 7, 12/2/01.

[27]St. Rec. Vol. 3 of 6, Mathis's Statement, pp. 2, 11, 1/8/02.

[28]*Id.*, at p. 4.

Stewart also suggests Terry McCall, the tow truck driver, would not have identified him as the person who paid the eighty-five dollar towing fee. He has not provided anything, and the record contains nothing, to establish that McCall would testify in this way.

Stewart also claims that Semaj Johnson's statement to police was in conflict with his statement that Leroy did not take off his mask until he got in the car. A review of Johnson's statement reflects that she told police that the man she saw was not wearing a covering over his face when he was upstairs in her house.[29] This does not necessarily conflict with Stewart's statements to police that Leroy had the mask on when he came out of the house shortly thereafter. This is especially true when comparing this to Burnell Johnson's statement that she only saw the man with the gun wearing a ski mask.

Burnell Johnson testified that the man with the gun had on a reddish-orange sweatshirt and the man who ended up dead on the lawn was wearing a black jacket.[30] Stewart suggests that counsel could have used this to show that his description of Leroy (the man with the gun) as wearing black was unreliable. Stewart fails to realize that Johnson's testimony could very well have been considered to be less reliable. Nevertheless, the focus of the testimony provided by Johnson was that the man with the gun, Leroy, and White broke into their home and after running upstairs, Leroy dragged White out after he was shot. This was very consistent with the rest of Stewart's confession. Stewart has not shown how further investigation or interviewing would have changed the outcome of his decision to enter the plea of guilty.

---

[29]St. Rec. Vol. 3 of 6, Semaj Johnson's Statement, p. 5, 12/1/01.

[30]St. Rec. Vol. 3 of 6, Burnell Johnson's Statement, pp. 9-11, 12/1/01.

In sum, after reviewing the statements from the various witnesses, Stewart has failed to establish that his counsel was deficient in not interviewing these witnesses prior to recommending the entry of the guilty plea, especially in light of the fact that the statements from the witnesses actually corroborate the relevant details of the events leading up to White's death.

Furthermore, in *Hill v. Lockhart*, the Supreme Court determined that where, as here, the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty, rather than go to trial, will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation regarding the plea. 474 U.S. at 370.

According to the information supplied by Stewart, along with a review of their respective statements, the witnesses about which he complains would have provided limited information indicating: (1) unidentified neighbors heard a red vehicle speeding down the street earlier on the evening of the murder; (2) his description of Leroy's clothing was not exactly the same as their descriptions; (3) he may not have been driving Mathis's car on the night of the murder; and (4) the tow truck driver might testify that he did not receive money from Stewart. The sum total of the information as suggested by Stewart is that if his counsel extracted this information from the witnesses, he would not have advised Stewart to plead guilty to manslaughter, despite Stewart's four inculpatory statements to the police.

The Court has already resolved that the statements of the witnesses are not in conflict with Stewart's confessions. Nevertheless, even if the witnesses provided the testimony as Stewart believes they would, the record does not support a finding that defense counsel acted unreasonably

in light of Stewart's statements to the police.[31]  Stewart's own words clearly weighed heavily in counsel's decision to recommend that Stewart enter a plea of guilty to manslaughter,  rather than second degree murder, with a significantly shorter sentence exposure.  Furthermore, counsel's advice came as a plea under *Crosby*, which allowed Stewart to continue his challenge to the admissibility of his inculpatory statements in the State's higher courts.

Judging counsel's performance at the time and under the circumstances, Stewart has failed to establish a deficiency in his performance or that he would not have entered the plea.  Stewart's claim of ineffective assistance of counsel based upon his counsel's alleged failure to interview Mathis, McCall, Carrigan, S. Johnson, White and B. Johnson is without merit.  Denial of relief on this claim was not contrary to or an unreasonable application of federal law.

### (j)-(l)  Counsel's Performance was Deficient, was not Sound Trial Strategy, and was Prejudicial

Stewart complains overall that, in light of the foregoing, his counsel's performance violated his Sixth Amendment right to effective counsel.  He argues that, because of counsel's  failure to interview and investigate further, there was no evidence of guilt other than his statements to police, which should have been suppressed.  He argues this, along with the state courts'  failure to grant relief,  was contrary to *Strickland*.  After a thorough review of each of Stewart's arguments in support of his ineffective assistance of counsel claim, the Court finds Stewart fails to demonstrate that counsel was deficient or that his performance prejudiced Stewart as envisioned by the Supreme Court in *Strickland* and *Hill*.

---

[31]The Court reiterates that Stewart has not provided any proof or affidavits from these witnesses which would establish that their testimony would be as presented by Stewart.

Therefore, for all of the foregoing reasons, the state courts' denial of relief on Stewart's ineffective assistance of counsel claim was neither contrary to, nor an unreasonable application of, Supreme Court precedent. Stewart is not entitled to relief on this claim.

**VII.    Recommendation**

It is therefore **RECOMMENDED** that Vincent Stewart's petition for issuance of a writ of habeas corpus be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings  and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[32]

New Orleans, Louisiana, this 20th August, 2010.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[32]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.